FILED
09/26/2018
Clerk of the
Appellate Courts

IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
July 19, 2018 Session

## MARIA KALIS BUCHANAN v. RODNEY M. BUCHANAN

**Appeal from the Circuit Court for Washington County**
**No. 33116     Jean A. Stanley, Judge**

_____

**No. E2017-02364-COA-R3-CV**

_____

In this divorce action, the trial court entered a "Judgment and Parenting Plan" on July 10, 2017, which addressed, *inter alia*, issues regarding division of the parties' assets and debts, co-parenting time with the parties' minor children, child support, and alimony. Within thirty days of entry of the judgment, the parties filed competing motions, pursuant to Tennessee Rule of Civil Procedure 59, seeking amendment of the July 10, 2017 judgment. The trial court conducted a hearing regarding the Rule 59 motions on August 1, 2017; issued an oral ruling; and directed the mother's counsel to prepare an order. On August 7, 2017, the father filed a petition seeking to modify the parties' permanent parenting plan in order to reflect that one of the children had recently been spending minimal time with the mother. Subsequently, on September 11, 2017, the father filed a motion seeking recusal of the trial court judge, asserting that the judge had exhibited bias against the father or his counsel by the judge's statements and actions during the August 1, 2017 hearing. On November 6, 2017, the trial court entered an order disposing of the Rule 59 motions. Later that same day, the trial court entered a separate order granting the recusal motion. The mother filed an appeal from the trial court's order concerning the Rule 59 motions. On appeal, the father filed a motion to dismiss the appeal and a motion seeking this Court's consideration of certain post-judgment facts. We grant the father's motion to consider post-judgment facts and deny his motion to dismiss the mother's appeal. Discerning no error in the trial court's distribution of marital assets and allocation of debts, we affirm such adjudications in their entirety. We vacate, however, the trial court's award of rehabilitative alimony and remand the spousal support issue to the trial court for further proceedings consistent with this opinion. We grant the mother's request for an award of attorney's fees on appeal, remanding that issue to the trial court for a determination of the appropriate amount of reasonable attorney's fees to be awarded.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court**
**Affirmed in Part, Vacated in Part; Case Remanded**

THOMAS R. FRIERSON, II, J., delivered the opinion of the court, in which D. MICHAEL SWINEY, C.J., and JOHN W. MCCLARTY, J., joined.

Jason A. Creech and Matthew F. Bettis, Johnson City, Tennessee, for the appellant, Maria Kalis Buchanan.

David W. Blankenship, Kingsport, Tennessee, for the appellee, Rodney M. Buchanan.

**OPINION**

I.  Factual and Procedural Background

On April 15, 2014, Maria Kalis Buchanan ("Mother") filed a complaint seeking a legal separation from the defendant, Rodney M. Buchanan ("Father"), in the Circuit Court for Washington County ("trial court").  Mother also filed a proposed permanent parenting plan, designating Mother as the primary residential parent of the minor children and proposing that Father would have sixty-five days per year of co-parenting time.  Father subsequently filed an answer and counterclaim, asserting that the parties should be granted a divorce based on irreconcilable differences.

Following an unsuccessful attempt to mediate by the parties, the trial court conducted a bench trial concerning this matter on May 11, 2017.  On July 10, 2017, the trial court entered a "Judgment and Parenting Plan," which provided that the parties would be declared divorced pursuant to Tennessee Code Annotated § 36-4-129(b).  The judgment also stated that the attached permanent parenting plan and child support worksheet would be incorporated therein.  The incorporated permanent parenting plan provided, *inter alia*, that each parent would have equal co-parenting time with the eldest child but that Mother would have 285 days of co-parenting time and Father would have eighty days with the youngest child annually.  The judgment further stated that Father would pay rehabilitative alimony payments to Mother of $2,500 per month for four years.  The court divided the parties' assets and debts in a nearly equal fashion, although it ordered Mother to be solely responsible for credit card debt incurred during the marriage in the total amount of $24,145.

On July 18, 2017, Mother filed a motion, pursuant to Tennessee Rule of Civil Procedure 59, seeking alteration of the July 10, 2017 judgment.  Mother asserted that the trial court had failed to address Father's temporary support arrearage that had amassed pending trial.  Mother also argued that Father's counsel had presented an incorrect child support worksheet to the court along with the proposed July 10, 2017 judgment that was ultimately entered.  Mother further claimed that she should not have been ordered to pay

2

the entire amount of marital credit card debt. Finally, Mother sought minor changes to the permanent parenting plan regarding holidays. On July 31, 2017, Father filed a response and countervailing Rule 59 motion, denying Mother's allegations of error and seeking a change in the parenting plan based on the fact that one of the children had chosen to spend minimal time with Mother.

On August 1, 2017, the trial court conducted a hearing regarding the Rule 59 motions. During the hearing, the trial court judge expressed that she was "upset" because Father's counsel had changed the child support worksheet that had been agreed upon by the parties and presented to the court during the May 11 hearing, such that the child support worksheet that was attached to the July 10, 2017 judgment signed by the court was incorrect. At the conclusion of the hearing, the court issued an oral ruling wherein the court (1) modified Father's child support obligation to $1,664 per month; (2) awarded to Mother a judgment in the amount of $15,000 for Father's child support arrearage; (3) affirmed Mother's sole responsibility for the credit card debt; (4) modified the co-parenting holiday schedule slightly; and (5) awarded to Mother $500 in attorney's fees. The court directed Mother's counsel to prepare an order.

On August 7, 2017, Father filed a petition seeking to modify the parties' permanent parenting plan in order to reflect that the eldest child had been spending minimal time with Mother. On September 11, 2017, Father filed a motion seeking recusal of the trial court judge, asserting that the judge had exhibited bias against Father or his counsel by the judge's statements and actions during the August 1, 2017 hearing. On November 3, 2017, Mother filed a petition seeking to modify the parties' permanent parenting plan and increase her alimony award. Mother further sought a finding that Father was in contempt of court for his failure to comply with previous orders of the court.

On November 6, 2017, the trial court entered a written order concerning the pending Rule 59 motions. In this order, the trial court granted Mother's motion and set Father's child support obligation at $1,664 per month; awarded to Mother $500 in attorney's fees related to the child support correction; and ordered that Father's child support be paid through wage assignment. The court also awarded to Mother a judgment in the amount of $15,000 for Father's temporary support arrearage but affirmed its earlier ruling that Mother would be solely responsible for the entire credit card debt. In addition, the parties' permanent parenting plan was amended to reflect that the children would be with Mother on Greek Orthodox Easter and that the parties would alternate time on Christmas day.

Following entry of its order concerning the Rule 59 motions, the trial court entered a second order on November 6, 2017, with respect to the pending motion to recuse. In

this subsequent order, the trial court stated:

> This Court held a hearing on August 1, 2017, on the Rule 59 Motion filed by Maria Buchanan (hereinafter "wife"). Subsequent to that hearing, the attorneys could not agree on an order reflecting the rulings of the Court and each submitted a proposed Order. Those Orders were received by the Court in early September. Before the Court signed either of the proposed Orders, Rodney Buchanan (hereinafter "husband") filed a Motion for Recusal. A response to such motion was filed on September 18, 2017. The attorneys were contacted and given the opportunity to argue the motion. Due to various conflicts in schedules, such hearing has not been held. Although it is currently scheduled for a date in December, the Court finds that this is too great a delay and therefore issues this written order consistent with the Rules.
>
> This leaves pending before the Court the competing Orders on the Rule 59 Motion and the subsequent Motion for Recusal. First, the Court finds that the competing Orders should be resolved and an Order has been entered consistent with the Court's ruling on the Rule 59 Motion. The Court finds there is good cause to sign such order reflecting all actions taken by the Trial Court prior to the Motion to Recuse. Otherwise, there will be no record of the Court's ruling and it would be as if such hearing were never held.

The trial court proceeded to address the motion to recuse, determining that although the trial court judge maintained no bias toward Father's counsel, "disagreements between the judge and the lawyer might create questions for the lay person about the judge's impartiality, even if the judge firmly believes she can be fair and impartial." The court thus granted the motion for recusal.[1]

Following entry of this order, Father filed a petition to modify pursuant to Tennessee Rule of Civil Procedure 60. Father also sought a finding of contempt against Mother and the appointment of a guardian *ad litem* for the children. Mother timely appealed.

---

[1] We note that, when faced with what the trial court ultimately concludes is a compelling motion to recuse, the trial court should "act[] promptly by written order in granting the recusal before entering any further orders and taking further action in the case." *See Rodgers v. Sallee*, No. E2013-02067-COA-R3-CV, 2015 WL 636740, at *5 (Tenn. Ct. App. Feb. 13, 2015). However, because the parties have not raised this as an issue on appeal, we decline to further address the propriety of the trial court's action concerning the recusal motion in this matter.

## II.  Issues Presented

Mother presents four issues for our review, which we have restated slightly:

1.      Whether the trial court abused its discretion by ordering Mother to pay the entire amount of marital credit card debt totaling $24,145.

2.      Whether the trial court abused its discretion by awarding to Mother rehabilitative alimony in the amount of $2,500 per month for only four years.

3.      Whether the trial court's marital property distribution was inequitable because the court awarded the marital residence to Father.

4.      Whether Mother is entitled to attorney's fees and costs on appeal.

Although Father did not raise any additional issues in his brief, he did file a motion with this Court seeking dismissal of Mother's appeal, alleging that there existed no valid, final judgment because the trial court had not resolved all issues with regard to the parties' permanent parenting plan.  In her response, Mother argued that the order resolving the Rule 59 motions was a final order and that the filing of any post-divorce petitions to modify did not affect its finality.  On June 11, 2018, this Court entered an Order deferring Father's motion to the panel and directing the parties to address this issue during oral argument.

Father subsequently filed a motion requesting that this Court consider certain post-judgment facts.  In his motion, Father alleged that the trial court had "recognized that there was not a final agreement with respect to the parenting time for each child" and had subsequently entered an order on July 6, 2018, which addressed all parenting plan issues and the resultant child support amount.  Mother responded, asserting that the permanent parenting plan had been finalized before the July 6, 2018 modification and also that the permanent parenting plan was irrelevant to the issues on appeal.  We note that the trial court's July 6, 2018 order was attached to Father's motion for our review.

## III.  Standard of Review

In a case involving the proper classification and distribution of assets incident to a divorce, our Supreme Court has elucidated the applicable standard of appellate review as follows:

This Court gives great weight to the decisions of the trial court in dividing marital assets and "we are disinclined to disturb the trial court's decision unless the distribution lacks proper evidentiary support or results in some error of law or misapplication of statutory requirements and procedures." *Herrera v. Herrera*, 944 S.W.2d 379, 389 (Tenn. Ct. App. 1996). As such, when dealing with the trial court's findings of fact, we review the record de novo with a presumption of correctness, and we must honor those findings unless there is evidence which preponderates to the contrary. Tenn. R. App. P. 13(d); *Union Carbide Corp. v. Huddleston*, 854 S.W.2d 87, 91 (Tenn. 1993). Because trial courts are in a far better position than this Court to observe the demeanor of the witnesses, the weight, faith, and credit to be given witnesses' testimony lies in the first instance with the trial court. *Roberts v. Roberts*, 827 S.W.2d 788, 795 (Tenn. Ct. App. 1991). Consequently, where issues of credibility and weight of testimony are involved, this Court will accord considerable deference to the trial court's factual findings. *In re M.L.P.*, 228 S.W.3d 139, 143 (Tenn. Ct. App. 2007) (citing *Seals v. England/Corsair Upholstery Mfg. Co.*, 984 S.W.2d 912, 915 (Tenn. 1999)). The trial court's conclusions of law, however, are accorded no presumption of correctness. *Langschmidt v. Langschmidt*, 81 S.W.3d 741, 744-45 (Tenn. 2002).

*Keyt v. Keyt*, 244 S.W.3d 321, 327 (Tenn. 2007). Questions relating to the classification of assets as marital or separate are questions of fact. *Bilyeu v. Bilyeu*, 196 S.W.3d 131, 135 (Tenn. Ct. App. 2005).

Further, as this Court has previously held:

Because Tennessee is a "dual property" state, a trial court must identify all of the assets possessed by the divorcing parties as either separate property or marital property before equitably dividing the marital estate. Separate property is not subject to division. In contrast, Tenn. Code Ann. § 36-4-121(c) outlines the relevant factors that a court must consider when equitably dividing the marital property without regard to fault on the part of either party. An equitable division of marital property is not necessarily an equal division, and § 36-4-121(a)(1) only requires an *equitable* division.

*McHugh v. McHugh*, No. E2009-01391-COA-R3-CV, 2010 WL 1526140, at *3-4 (Tenn. Ct. App. Apr. 16, 2010) (internal citations omitted). *See also Manis v. Manis*, 49 S.W.3d 295, 306 (Tenn. Ct. App. 2001) (holding that appellate courts reviewing a distribution of marital property "ordinarily defer to the trial judge's decision unless it is inconsistent

6

with the factors in Tenn. Code Ann. § 36-4-121(c) or is not supported by a preponderance of the evidence.").

Regarding alimony, our Supreme Court has "repeatedly and recently observ[ed] that trial courts have broad discretion to determine whether spousal support is needed and, if so, the nature, amount, and duration of the award." *See Gonsewski v. Gonsewski*, 350 S.W.3d 99, 105 (Tenn. 2011). The High Court further explained:

> [A] trial court's decision regarding spousal support is factually driven and involves the careful balancing of many factors. As a result, "[a]ppellate courts are generally disinclined to second-guess a trial judge's spousal support decision." *Kinard* [*v. Kinard*], 986 S.W.2d [220,] 234 [(Tenn. Ct. App. 1998)]. Rather, "[t]he role of an appellate court in reviewing an award of spousal support is to determine whether the trial court applied the correct legal standard and reached a decision that is not clearly unreasonable." *Broadbent v. Broadbent*, 211 S.W.3d 216, 220 (Tenn. 2006). Appellate courts decline to second-guess a trial court's decision absent an abuse of discretion. An abuse of discretion occurs when the trial court causes an injustice by applying an incorrect legal standard, reaches an illogical result, resolves the case on a clearly erroneous assessment of the evidence, or relies on reasoning that causes an injustice. This standard does not permit an appellate court to substitute its judgment for that of the trial court, but "'reflects an awareness that the decision being reviewed involved a choice among several acceptable alternatives,' and thus 'envisions a less rigorous review of the lower court's decision and a decreased likelihood that the decision will be reversed on appeal.'" *Henderson* [*v. SAIA, Inc.*], 318 S.W.3d [328,] 335 [(Tenn. 2010)] (quoting *Lee Medical, Inc. v. Beecher*, 312 S.W.3d 515, 524 (Tenn. 2010)). Consequently, when reviewing a discretionary decision by the trial court, such as an alimony determination, the appellate court should presume that the decision is correct and should review the evidence in the light most favorable to the decision.

*Id*. at 105-06 (other internal citations omitted).

### IV. Father's Motions Filed During Appeal

As a threshold issue, we first must address Father's pending motion to dismiss this appeal for lack of a final judgment and Father's separate motion for this Court to consider post-judgment facts. Father asserts in his dismissal motion that because there were petitions pending in the trial court that sought modification of the parties' parenting plan

at the time the notice of appeal was filed, there was no final judgment from which an appeal could lie. In support of his argument, Father has asked this Court to consider post-judgment facts regarding the proceedings conducted by the trial court following the filing of the notice of appeal.

This Court has previously explained as follows with regard to a motion to consider post-judgment facts:

> Pursuant to Rule 14 of the Tennessee Rules of Appellate Procedure, this Court may consider facts occurring after the judgment in the trial court. *See* Tenn. R. App. P. 14(a) ("The Supreme Court, Court of Appeals, and Court of Criminal Appeals on its motion or on motion of a party may consider facts concerning the action that occurred after judgment."). According to Rule 14:
>
>> While neither controlling nor fully measuring the court's discretion, consideration generally will extend only to those facts, capable of ready demonstration, affecting the positions of the parties or the subject matter of the action such as mootness, bankruptcy, divorce, death, other judgments or proceedings, relief from the judgment requested or granted in the trial court, and other similar matters.
>
> Tenn. R. App. P. 14(a). This Court's decision to grant or deny a motion to consider post-judgment facts is discretionary. Motions to consider post-judgment facts are governed by Rule 22's motion practice. Tenn. R. App. P. 14(b) ("A motion in the Supreme Court, Court of Appeals, or Court of Criminal Appeals to consider post-judgment facts pursuant to subdivision (a) of this rule shall be made in the manner provided in rule 22."). The Advisory Committee Comments to Rule 14 indicate that post-judgment facts are appropriate for consideration when they are "unrelated to the merits[,] [] not genuinely disputed, [and] necessary to keep the record up to date.

*Stacey Fair v. Clarksville Montgomery Cty. Sch. Sys.*, No. M2017-00206-COA-R3-CV, 2017 WL 4773424, at *2 (Tenn. Ct. App. Oct. 23, 2017).

With his motion seeking this Court's consideration of post-judgment facts, Father filed a copy of the trial court's "Memorandum Opinion and Order," dated July 6, 2018. In said order, the trial court explained that it was acting on the parties' competing petitions to modify the permanent parenting plan previously entered by the court. The

court determined that a modification of the parties' parenting plan was necessary due to proof presented during a June 2018 hearing that a material change in circumstance had occurred since entry of the original parenting plan.

We determine, in our discretion, that it is appropriate to consider the post-judgment facts contained in the July 2018 order because the order represents "facts, capable of ready demonstration, affecting the positions of the parties or the subject matter of the action such as mootness, bankruptcy, divorce, death, other judgments or proceedings, relief from the judgment requested or granted in the trial court, and other similar matters." *See* Tenn. R. App. P. 14(a). The post-judgment facts included therein are also "unrelated to the merits" of the appeal, are "not genuinely disputed, [and] necessary to keep the record up to date." *See Stacey Fair*, 2017 WL 4773424, at *2 (quoting Advisory Committee Comments to Tenn. R. App. P. 14). We therefore grant Father's motion to consider such facts.

Father asserts that the July 6, 2018 order, entered during the pendency of this appeal, supports his position that no final permanent parenting plan had been entered prior to that date. We disagree. The record clearly demonstrates that at the time of the parties' divorce on July 10, 2017, the trial court entered a "Judgment and Parenting Plan," which addressed all issues raised during the May 2017 divorce trial. Although both parties filed motions, pursuant to Tennessee Rule of Civil Procedure 59, seeking to alter or amend this judgment, those motions were resolved by the trial court's subsequent November 6, 2017 order. Accordingly, the permanent parenting plan became a final, appealable order following its slight modification by the court's November 6, 2017 order addressing the competing Rule 59 motions. *See* Tenn. R. App. P. 4(b).

Father argues that his petition to modify, which was filed prior to entry of the trial court's order on the Rule 59 motions and which sought to modify the permanent parenting plan due to changes in circumstance arising <u>after</u> the May 2017 divorce trial, affected the finality of the permanent parenting plan in some manner. Specifically, Father asserts that his petition, filed on August 7, 2017, "to modify the parenting plan to reflect that the Parties' oldest child . . . is spending no time with [Mother]," renders the parenting plan non-final because Father's motion was pending when the notice of appeal was filed.

We note that when the issue of modifying the permanent parenting plan was raised during the August 2017 hearing on the Rule 59 motions, the trial court stated:

> Well, I'm not going to alter a Parenting Plan on some kind of post-trial Motion to Amend. That's a whole different subject. I've already made a ruling on the facts that I heard in Court. I need a Final Order down on that.

Then if you all want to modify the Parenting Plan the Court ordered, we'll go from there.

The trial court thus proceeded to rule on the pending Rule 59 motions, entering its subsequent written order on November 6, 2017.

Following Mother's appeal to this Court, the trial court conducted a hearing regarding the respective petitions to modify the permanent parenting plan filed by both parties, one of which was Father's petition filed on August 7, 2017. The court heard evidence and determined that "a material change of circumstances [had] occurred since the entry of the original Parenting Plan justifying a modification of the Plan." The court relied upon Tennessee Code Annotated § 36-6-101(a)(2)(C) (2017), which provides:

If the issue before the court is a modification of the court's prior decree pertaining to a residential parenting schedule, then the petitioner must prove by a preponderance of the evidence a material change of circumstance affecting the child's best interest. A material change of circumstance does not require a showing of a substantial risk of harm to the child. A material change of circumstance for purposes of modification of a residential parenting schedule may include, but is not limited to, significant changes in the needs of the child over time, which may include changes relating to age; significant changes in the parent's living or working condition that significantly affect parenting; failure to adhere to the parenting plan; or other circumstances making a change in the residential parenting time in the best interest of the child.

Tennessee Code Annotated § 36-6-101(a)(2)(C) applies only to permanent parenting plans that are final. *See In re Samuel P.*, No. W2016-01665-COA-R3-JV, 2018 WL 1046784, at *11 (Tenn. Ct. App. Feb. 23, 2018) (explaining that a parenting plan that is final is *res judicata* as to the facts that existed at the time it was entered, such that a modification of the plan requires a showing of a material change in circumstance). If the parenting plan is temporary or non-final, no showing of a material change in circumstance would be required. *Id.* Therefore, the trial court's July 6, 2018 order, demonstrating that the court required proof of a material change in circumstance in order to modify the parenting plan, actually supports the finality of the earlier parenting plan.

Having thoroughly considered the orders in the appellate record along with the July 6, 2018 order, we determine that Father's motion to dismiss this appeal for lack of a final judgment should be denied. The trial court's July 10, 2017 "Judgment and Parenting Plan" became final and appealable following the trial court's November 6, 2017 order disposing of the Rule 59 motions, as stated in Tennessee Rule of Appellate

Procedure 4(b). The trial court appropriately treated the parenting plan as final and afforded it *res judicata* effect during the subsequent modification proceedings. *See In re Samuel P.*, 2018 WL 1046784, at *11. Father's motion to dismiss is without merit.

## V. Distribution of Marital Assets and Allocation of Marital Debt

Mother argues that the trial court's distribution of marital assets and division of marital debts were inequitable. Mother specifically takes issue with two separate provisions contained within the trial court's distribution of marital assets and debt allocation in the July 2017 judgment: (1) the trial court's assessment of all marital credit card debt to Mother and (2) the trial court's award of the marital residence to Father. We will address each of these issues in turn.

With regard to the allocation of marital debt, Mother asserts that the trial court inconsistently applied the factors announced by our Supreme Court in *Alford v. Alford*, 120 S.W.3d 810, 813-814 (Tenn. 2003), wherein the Court explained:

> "Marital debt" is not defined by any Tennessee statute and has never before been defined by this Court. However, marital debts are subject to equitable division in the same manner as marital property. *Cutsinger v. Cutsinger*, 917 S.W.2d 238, 243 (Tenn. Ct. App. 1995); *Mondelli* [*v. Howard*], 780 S.W.2d [769,] 773 [(Tenn. Ct. App. 1989)]. We take this opportunity to define "marital debt" consistent with the definition of "marital property" in Tennessee. "Marital property" is defined by statute as "all real and personal property, both tangible and intangible, acquired by either or both spouses during the course of the marriage up to the date of the final divorce hearing and owned by either or both spouses as of the date of filing a complaint for divorce . . . ." Tenn. Code Ann. § 36-4-121(b)(1)(A) (2001). We now hold that "marital debts" are all debts incurred by either or both spouses during the course of the marriage up to the date of the final divorce hearing.
>
> * * *
>
> Tennessee courts should use the four factors listed in *Mondelli* as guidelines in the equitable distribution of marital debt: (1) the debt's purpose; (2) which party incurred the debt; (3) which party benefitted from incurring the debt; and (4) which party is best able to repay the debt. *Mondelli*, 780 S.W.2d at 773. A careful application of these factors will insure the fairest possible allocation of debt. It will also protect the spouse

11

who did not incur the debt from bearing responsibility for debts that are the result of personal excesses of the other spouse.

In the case at bar, Mother filed a "Rule 9 Statement of Income and Expenses" on July 25, 2014, in which she listed debts owed to Kohl's, USAA, and Chase, totaling $22,800, along with the average monthly payment due. Mother filed an "Amended Rule 9 Statement of Income and Expenses" on May 19, 2016, in which she listed the same three creditors with a total balance owed of $24,145. During trial, following the conclusion of the proof and while the court was issuing its ruling, the trial court judge stated:

Trial Court: We have not talked about these other debts. She has listed on her income and expense sheet, pretty sizeable credit card debt. All right. Last year, Kohl's, I don't know what has happened since then but it's Kohl's, $1,300.00, USAA, $17,645.00, Chase, $5,200.00. Are those still in existence?

Mother's Counsel: She says they are about the same.

Father's Counsel: I haven't seen any statements, Your Honor.

Mother's Counsel: Judge, we had them in mediation.

Father's Counsel: Well, that's wonderful but we haven't seen them.

Trial Court: If you want statements, ask for them. I mean, these are credit cards. I assume while, obviously it was incurred during the marriage because they are still married as we sit here. I need to know, what are you all planning on doing with them?

Mother's Counsel: Judge, we'll provide updated statements. She does have the one from Kohl's but not the other two.

Trial Court: Okay. Nobody talked about them. What do you want me to do with them?

Father's Counsel: I think they ought to stay in her home, they are her debts. She's certainly got sufficient assets to pay them.

Mother's Counsel:    Judge, they are marital debts that she . . . .

Trial Court:           I have no proof whatsoever. Come on back up, Ms. Buchanan, let's put on some more proof?

Mother accordingly supplied additional testimony regarding the credit card debt, stating that the Kohl's account was opened during the marriage and used to purchase clothing and necessities for the children. Mother similarly testified that the USAA credit card was opened during the marriage. When asked why the card had such a high balance, Mother replied:

I was using it to help with items for the kids and gas and so forth during the marriage. When we were married he had me on a very tight budget. He expected me to, he only gave me about $800.00 a month to spend for groceries for the kids, for all four daughters, clothing, necessities and so forth. I would have to use that if I needed items for the kids.

When questioned further by the trial court regarding whether she had statements for these accounts, Mother replied that she did not have them but could obtain them. The trial court replied:

When on earth did you think I would need them? When did you reckon we were going to take a look at this? All right, what about the Chase?

Mother replied that the Chase account had been open for several years and was also used to buy things for the children. Mother proposed that Father be assessed with one-half of the total credit card debt amount. On cross-examination, Mother admitted that Father had not used the Kohl's credit card and again acknowledged that she had brought no statements to substantiate her testimony regarding the items charged on the other credit card accounts.

Father then took the stand, and he testified that he had a discussion with Mother about the credit card debt "several years ago," at which time they consolidated the debt by paying off the cards, utilizing their home equity line of credit. According to Father, Mother agreed at that time that "[s]he was not going to run them back up." Father stated that he did not feel that he should have to pay one-half of this debt because (1) he had never used the cards and (2) he bought clothing and items for the children also. Father also asserted that he and his counsel had asked for statements concerning these accounts from Mother but that the statements had never been provided. Mother's counsel acknowledged that although the credit card statements had been requested in discovery in

13

2014, the responses did not demonstrate that such statements were attached. The trial court accordingly directed Mother and her counsel to provide the statements to Father and his counsel within thirty days, after which time the court would hold a brief hearing or telephone conference concerning the issue.

In its subsequently entered July 2017 judgment, the trial court stated as follows regarding the credit card debt:

[Mother] has listed credit card debts on her Rule 9 Statement.

With respect to the Rule 9 credit card debts, the Court finds that [Mother] did not supplement her interrogatory answers of 2014 and therefore, the credit card debts shall be her responsibility. Those include Kohl's, USAA, and Chase.

(Paragraph numbering omitted).

In Mother's motion to alter or amend, filed following entry of the trial court's written judgment, Mother asserted that the trial court erred by assessing the entire amount of marital credit card debt to her. During the hearing on the Rule 59 motions, Father's counsel argued (and Mother's counsel did not deny) that the statements were not sent until July 18, 2017, which was more than sixty days after the trial. Following the conclusion of the parties' arguments, the trial court stated:

This Court very clearly gave [Mother] 30 days from the date of the trial to get that information over to the other side. I'm through pulling teeth on this. I have tried and tried to get everybody to give the other side, especially [Mother] to give [Father's] side documents for years. I'm done. She had 30 days to do that. She did not do it. The credit card debt is hers. And I will on that point make one other comment, and I commented on this in the trial, is that [Mother] went through a ton of money, just cash money gone, and she told me repeatedly - I remember it - it was for the girls, it was for the girls. I think I ended up with like $65,000.00 in two years for the girls. That's a lot of money for the girls. I have no doubt that these credit cards got, just got ran up, period. So they're yours, [Mother].

On appeal, Mother argues that the trial court erred in assessing the entire amount of marital credit card debt to Mother "by ruling that [Mother] failed to 'supplement' her interrogatories." Our review of the record demonstrates that what actually transpired during the trial court proceedings was substantially more complex. Mother initially disclosed the marital debt in her pleadings and claimed during trial that it was incurred

14

for the children while Father disputed the debt's necessity and purpose by claiming that the parties had paid off the debt years earlier and that Mother was not supposed to incur further debt. The trial court allowed Mother additional time to provide proof of the debt's purpose, but Mother did not produce such evidence. The trial court initially assessed the debt to Mother, and Mother requested in her Rule 59 motion that the court amend this ruling. During the hearing on the Rule 59 motions, the trial court determined that the debt should be assessed to Mother based on Mother's lack of proof demonstrating that the debt was incurred for the children. The court further observed that the amounts Mother claimed to have spent on the children during the pendency of the divorce proceedings were excessive.

Applying the factors delineated in *Alford*, 120 S.W.3d at 813-814, we note that the only proof in the record regarding the debt's purpose is Mother's testimony that it was incurred for the children and Father's testimony challenging Mother's assertion. The combined debt was undisputedly incurred by Mother; Father testified that he had never utilized any of the credit cards in question. It would appear that Mother benefitted from incurring the debt because Father claimed to have no knowledge of what was purchased and received no personal benefit therefrom, and Mother did not dispute his testimony. Finally, Mother was awarded sufficient assets in the divorce from which she should be able to repay the debt. We determine that the trial court did not err in assessing the total amount of marital credit card debt to Mother. By doing so, the trial court clearly intended to "protect the spouse who did not incur the debt from bearing responsibility for debts that are the result of personal excesses of the other spouse." *Id.* at 814.

Concerning Mother's assertion that the trial court erred by awarding the marital residence to Father, we note that when a party to a divorce appeals the trial court's decision concerning a division of marital property and "wishes to focus on whether the division as to particular assets was equitable rather than whether the overall property distribution was equitable," this Court will "decline to do so as the goal is an overall equitable marital property distribution." *See Morton v. Morton*, 182 S.W.3d 821, 834 (Tenn. Ct. App. 2005). Tennessee Code Annotated § 36-4-121 (Supp. 2016) addresses the equitable division of marital property pursuant to divorce, providing in pertinent part:

> (a)(1) In all actions for divorce or legal separation, the court having jurisdiction thereof may, upon request of either party, and prior to any determination as to whether it is appropriate to order the support and maintenance of one (1) party by the other, equitably divide, distribute or assign the marital property between the parties without regard to marital fault in proportions as the court deems just.

> \* \* \*

15

(c)     In making equitable division of marital property, the court shall consider all relevant factors including:

(1)     The duration of the marriage;

(2)     The age, physical and mental health, vocational skills, employability, earning capacity, estate, financial liabilities and financial needs of each of the parties;

(3)     The tangible or intangible contribution by one (1) party to the education, training or increased earning power of the other party;

(4)     The relative ability of each party for future acquisitions of capital assets and income;

(5)(A)     The contribution of each party to the acquisition, preservation, appreciation, depreciation or dissipation of the marital or separate property, including the contribution of a party to the marriage as homemaker, wage earner or parent, with the contribution of a party as homemaker or wage earner to be given the same weight if each party has fulfilled its role;

(B)     For purposes of this subdivision (c)(5), dissipation of assets means wasteful expenditures which reduce the marital property available for equitable distributions and which are made for a purpose contrary to the marriage either before or after a complaint for divorce or legal separation has been filed.

(6)     The value of the separate property of each party;

(7)     The estate of each party at the time of the marriage;

(8)     The economic circumstances of each party at the time the division of property is to become effective;

(9)     The tax consequences to each party, costs associated with the reasonably foreseeable sale of the asset, and other reasonably foreseeable expenses associated with the asset;

> (10)  The amount of social security benefits available to each spouse; and
>
> (11)  Such other factors as are necessary to consider the equities between the parties.

As this Court has explained with regard to an equitable marital property distribution:

> The approach to dividing a marital estate should not be mechanical, but rather should entail carefully weighing the relevant factors in Tenn. Code Ann. § 36-4-121(c) in light of the evidence that the parties have presented. Trial courts have broad discretion in fashioning an equitable division of marital property, and appellate courts must accord great weight to a trial court's division of marital property. . . . [O]ur role is to determine whether the trial court applied the correct legal standards, whether the manner in which the trial court weighed the factors in Tenn. Code Ann. § 36-4-121(c) is consistent with logic and reason, and whether the trial court's division of the marital property is equitable.

*Owens v. Owens*, 241 S.W.3d 478, 490 (Tenn. Ct. App. 2007), *perm. app. denied* (Tenn. Sept. 17, 2007).

In the case at bar, we acknowledge that the trial court failed to make detailed factual findings regarding the statutory factors referenced above. As this Court has explained, however:

> On occasion, when a trial judge fails to make findings of fact and conclusions of law, the appellate court "may 'soldier on' when the case involves only a clear legal issue, or when the court's decision is 'readily ascertainable.'" *Hanson v. J.C. Hobbs Co., Inc.*, No. W2011-02523-COA-R3-CV, 2012 WL 5873582, at *10 (Tenn. Ct. App. Nov. 21, 2012) (quoting *Simpson v. Fowler*, No. W2011-02112-COA-R3-CV, 2012 WL 3675321, at *4 (Tenn. Ct. App. Aug. 28, 2012)).

*Manning v. Manning*, 474 S.W.3d 252, 260 (Tenn. Ct. App. 2015) (quoting *Pandey v. Shrivastava*, No. W2012-00059-COA-R3-CV, 2013 WL 657799, at *5 (Tenn. Ct. App. Feb. 22, 2013)). We determine that the trial court's decision is "readily ascertainable" concerning this issue.

The evidence presented at trial demonstrated that the parties' marriage was of approximately eighteen years' duration. Father was fifty-five years old, and Mother was fifty-one years of age at the time of trial, establishing that there was no great disparity in the parties' ages. Father testified that he suffered from a physical condition as the result of a fall that left him partially disabled. Mother testified that she had little history of employment outside the home during the marriage, having worked primarily as a homemaker and caretaker for the parties' children. At the time of trial, Mother had been employed at East Tennessee State University for two years, earning approximately $1,500 per month. Mother testified that she had received distributions from her mother's estate and/or trust during the marriage in the amount of $85,000, of which approximately $6,000 remained. Mother also testified that she had recently begun taking one college course per semester toward earning her undergraduate degree.

Father testified that he was employed by Wells Fargo as a financial adviser and had held that position for twelve years. Father also testified that he had previously served in the military for twenty years and had obtained his bachelor's degree during that time. According to Father, he had suffered a fall and fractured his back, which resulted in a 2015 back surgery. Father related that he suffered from ongoing pain but did not claim that he was unable to work. Father testified that he earned in excess of $100,000 in the year prior to trial, but he also explained that he felt his income would decrease in the future due to various circumstances beyond his control. Father admitted that at the time of trial, he had a monthly surplus of approximately $3,667 after payment of his regular expenses.

Our thorough review of the trial court's distribution of marital property in this matter demonstrates that the court's overall distribution was equitable. The parties' equity in the marital residence was valued at $46,000, which the trial court divided equally by ordering Father to pay $23,000 to Mother. Father was allowed to keep the marital residence along with its attendant mortgage in the amount of $174,000. Both parties acknowledged during their testimony that the marital home was in need of repairs. In its oral ruling, the court noted that Mother did not have sufficient income to make the necessary repairs to the marital residence and pay the mortgage.

The only other marital assets of significant value were the parties' 401(k) accounts, which were likewise divided equally between the parties. In addition, each party was permitted to retain certain vehicles and personalty, with other vehicles ordered to be sold and the proceeds divided equally. As Mother concedes in her tabulation of property pursuant to Tennessee Court of Appeals Rule 7, each party received an equal amount of marital assets as valued by the trial court. We conclude that the trial court fashioned a nearly equal distribution of marital assets, and the proof supports such a

distribution when considering the applicable statutory factors. We accordingly decline to disturb or modify this equitable division.

## VI. Award of Spousal Support

Mother's next issue concerns whether the trial court abused its discretion by awarding to Mother $2,500 per month in rehabilitative alimony for only four years. In its written order, the trial court stated in pertinent part:

> The Court finds that this is an appropriate case for rehabilitative alimony and orders [Father] to pay to [Mother] the sum of $2,500.00 for a period of four (4) years. The Court deems this as rehabilitative alimony, which is modifiable by either party during the pendency of the payment of the alimony. With respect to the alimony, the Court makes it fully modifiable and the Court directs that it not cease during that term on the death of [Father] and therefore, should be secured with a life insurance policy on his life.

In its oral ruling, the trial court found that Mother was the economically disadvantaged spouse but that Mother's job prospects would be increased if she completed her college degree. The court determined that Mother would need monthly rehabilitative alimony for a period of time to allow her to seek her degree in a timely fashion. The court thus concluded that an award of $2,500 per month for a period of four years would enable Mother to "quit her job, take on a part-time job and finish her education."

Concerning the type and amount of an alimony award, Tennessee Code Annotated § 36-5-121 (2017) provides in pertinent part:

> (i)   In determining whether the granting of an order for payment of support and maintenance to a party is appropriate, and in determining the nature, amount, length of term, and manner of payment, the court shall consider all relevant factors, including:
>
>> (1)   The relative earning capacity, obligations, needs, and financial resources of each party, including income from pension, profit sharing or retirement plans and all other sources;
>>
>> (2)   The relative education and training of each party, the ability and opportunity of each party to secure such education and training, and the necessity of a party to

19

secure further education and training to improve such party's earnings capacity to a reasonable level;

(3)     The duration of the marriage;

(4)     The age and mental condition of each party;

(5)     The physical condition of each party, including, but not limited to, physical disability or incapacity due to a chronic debilitating disease;

(6)     The extent to which it would be undesirable for a party to seek employment outside the home, because such party will be custodian of a minor child of the marriage;

(7)     The separate assets of each party, both real and personal, tangible and intangible;

(8)     The provisions made with regard to the marital property, as defined in § 36-4-121;

(9)     The standard of living of the parties established during the marriage;

(10)    The extent to which each party has made such tangible and intangible contributions to the marriage as monetary and homemaker contributions, and tangible and intangible contributions by a party to the education, training or increased earning power of the other party;

(11)    The relative fault of the parties, in cases where the court, in its discretion, deems it appropriate to do so; and

(12)    Such other factors, including the tax consequences to each party, as are necessary to consider the equities between the parties.

Although the trial court did not make detailed factual findings with regard to the above factors, we note that several of the statutory factors, most notably Father's significantly greater earning capacity and higher level of education, militate in favor of an award of spousal support to Mother. Mother demonstrated a need for spousal support because her estimated monthly expenses were appreciably greater than her income. Father demonstrated an ability to pay alimony, admitting that he enjoyed a surplus of approximately $3,667 per month after payment of his regular expenses, although this amount would be reduced by Father's child support obligation. The record demonstrates that Father earned a gross income in excess of $100,000 per year while Mother earned approximately $21,000 per year. Mother's employability and earning capacity was clearly impacted by the years she spent as homemaker and caregiver for the children. The record also demonstrates that Mother had not finished her college degree, although she had recently returned to school by taking one class per semester in order to do so. As such, the trial court appropriately determined that Mother was the economically disadvantaged spouse and that Mother had demonstrated a need for alimony while Father demonstrated the ability to pay spousal support.

Mother asserts, however, that the trial court's award of rehabilitative alimony for four years was inappropriate because there was a dearth of proof that she could achieve an "earning capacity that will permit [Mother's] standard of living after the divorce to be reasonably comparable to the standard of living enjoyed during the marriage, or to the post-divorce standard of living expected to be available to [Father], considering the relevant statutory factors and the equities between the parties." *See* Tenn. Code Ann. § 36-5-121(e)(1) (definition of rehabilitation). We agree with Mother on this point.

Our statutory scheme regarding awards of alimony, set forth in Tennessee Code Annotated § 36-5-121, states in pertinent part:

(c)(1) Spouses have traditionally strengthened the family unit through private arrangements whereby one (1) spouse focuses on nurturing the personal side of the marriage, including the care and nurturing of the children, while the other spouse focuses primarily on building the economic strength of the family unit. This arrangement often results in economic detriment to the spouse who subordinated such spouse's own personal career for the benefit of the marriage. It is the public policy of this state to encourage and support marriage, and to encourage family arrangements that provide for the rearing of healthy and productive children who will become healthy and productive citizens of our state.

21

(2)     The general assembly finds that the contributions to the marriage as homemaker or parent are of equal dignity and importance as economic contributions to the marriage. Further, where one (1) spouse suffers economic detriment for the benefit of the marriage, the general assembly finds that the economically disadvantaged spouse's standard of living after the divorce should be reasonably comparable to the standard of living enjoyed during the marriage or to the post-divorce standard of living expected to be available to the other spouse, considering the relevant statutory factors and the equities between the parties.

(d)(1) The court may award rehabilitative alimony, alimony in futuro, also known as periodic alimony, transitional alimony, or alimony in solido, also known as lump sum alimony or a combination of these, as provided in this subsection (d).

(2)     It is the intent of the general assembly that a spouse, who is economically disadvantaged relative to the other spouse, be rehabilitated, whenever possible, by the granting of an order for payment of rehabilitative alimony. To be rehabilitated means to achieve, with reasonable effort, an earning capacity that will permit the economically disadvantaged spouse's standard of living after the divorce to be reasonably comparable to the standard of living enjoyed during the marriage, or to the post-divorce standard of living expected to be available to the other spouse, considering the relevant statutory factors and the equities between the parties.

(3)     Where there is relative economic disadvantage and rehabilitation is not feasible, in consideration of all relevant factors, including those set out in subsection (i), the court may grant an order for payment of support and maintenance on a long-term basis or until death or remarriage of the recipient, except as otherwise provided in subdivision (f)(2)(B).

* * *

(e)(1) Rehabilitative alimony is a separate class of spousal support, as distinguished from alimony in solido, alimony in futuro, and transitional alimony. To be rehabilitated means to achieve, with reasonable effort, an earning capacity that will permit the economically disadvantaged spouse's standard of living after the

22

divorce to be reasonably comparable to the standard of living enjoyed during the marriage, or to the post-divorce standard of living expected to be available to the other spouse, considering the relevant statutory factors and the equities between the parties.

In the case at bar, the trial court determined that Mother could be rehabilitated pursuant to the statutory definition. The trial court specifically stated in pertinent part:

This is not a transitional case. Then the Court has to decide, is this a permanent alimony case or is it a rehabilitative case. And the legislature of the State of Tennessee is certainly more in favor of rehabilitative alimony, that is reflected in the statute, we all know that. And it directs the Court to Order rehabilitative alimony when the disabled spouse can achieve, with reasonable effort, an earning capacity that will permit her standard of living after the divorce to be reasonable comparable to that she enjoyed during the marriage or reasonable comparable to the standard of living of the other spouse. It seems to the Court that Ms. Buchanan is very bright, nice looking woman. She will have no problem in the job market if she had a college degree. Will she live 100 percent to the earning capacity of Mr. Buchanan, I am not a seer. I can't look into the magic ball and tell you that. But it will certainly give her that earning potential. Will she achieve that taking one class a semester for ten years, that's so silly. That's a ridiculous plan. I do think she deserves an adequate opportunity to go back and get her college degree and to do it in a timely fashion. To do that she will need help in the form of monthly, rehabilitative alimony. Therefore, in addition to the child support, which I have been advised is $1,676.00, the Court is going to award her [$2,500] a month. With that amount and her child support, she can basically quit her job, take on a part-time job and finish her education, should she desire to do so. I will tell you this. I would think long and hard about a mass communication and art degree. Where in the heck are you going to get a job with that around here, I am not sure. I could be wrong. But think about it. If you're looking at a nursing degree or computer technology degree, I think you're looking at more money and a better chance at employment.

We determine, however, that the evidence presented at trial was insufficient to support the trial court's conclusion that Mother could be rehabilitated pursuant to the statutory definition. Assuming, *arguendo*, that Mother was able to obtain her undergraduate degree within the four-year period countenanced by the trial court, there was simply no evidence presented that higher-income employment opportunities would

23

be available to Mother thereafter. In fact, the trial court questioned Mother's choice of degree program, inquiring aloud where Mother would "get a job with that around here."

Furthermore, the trial court found that with the amount of rehabilitative alimony awarded to Mother, in addition to the amount of child support awarded, Mother would be able to "quit her job, take on a part-time job and finish her education." This finding is unsupported by the evidence, which demonstrated that Mother claimed a monthly shortfall of $4,450 while earning her full-time salary. In short, there was insufficient proof that Mother would be able to achieve an earning capacity that would permit her standard of living following the divorce "to be reasonably comparable to the standard of living enjoyed during the marriage, or to the post-divorce standard of living expected to be available" to Father. *See Sanders v. Sanders*, No. M2001-02694-COA-R3-CV, 2003 WL 21004628, at *3 (Tenn. Ct. App. May 6, 2003) ("The essential finding for an award of rehabilitative support is that the disadvantaged spouse is 'capable of rehabilitation.'").

Because the trial court's determination that Mother could be rehabilitated lacked a sufficient evidentiary foundation, we conclude that we must vacate the trial court's rehabilitative alimony award and remand this issue to the trial court for further hearing. Upon remand, the trial court may conduct a hearing concerning whether Mother is capable of being rehabilitated before making its determination concerning the appropriate type and amount of alimony to be awarded to Mother.

## VII. Attorney's Fees on Appeal

Finally, Mother seeks an award of attorney's fees incurred on appeal. As this Court has previous elucidated:

> Our supreme court has defined the factors that should be applied when considering a request for attorney fees incurred on appeal. These factors include the ability of the requesting party to pay the accrued fees, the requesting party's success in the appeal, whether the requesting party sought the appeal in good faith, and any other equitable factor that need be considered. *See Folk v. Folk*, 357 S.W.2d 828, 829 (Tenn. 1962).

*Stratienko v. Stratienko*, 529 S.W.3d 389, 413 (Tenn. Ct. App. 2017) (quoting *Dulin v. Dulin*, No. W2001-02969-COA-R3-CV, 2003 WL 22071454, at *10 (Tenn. Ct. App. Sept. 3, 2003)).

In the case at bar, Mother was partially successful in her appeal, and the appeal was clearly sought in good faith. Furthermore, Mother has a limited ability to pay her attorney's fees due to her economic disadvantage. We therefore determine that Mother

should be awarded one-half of the amount of reasonable attorney's fees she incurred on appeal.  We remand this issue to the trial court for a determination as to the proper amount of such attorney's fee award.

## VIII.  Conclusion

For the foregoing reasons, we grant Father's motion to consider post-judgment facts and deny his motion to dismiss Mother's appeal.  We affirm the trial court's distribution of marital assets and allocation of marital debts in their entirety.  We vacate, however, the trial court's award of rehabilitative alimony and remand the spousal support issue to the trial court for further proceedings consistent with this opinion.  We grant Mother's request for an award of reasonable attorney's fees on appeal, and we also remand that issue to the trial court for a determination of the appropriate amount of attorney's fees to be awarded.  Costs on appeal are taxed one-half to the appellant, Maria Kalis Buchanan, and one-half to the appellee, Rodney M. Buchanan.

_____
THOMAS R. FRIERSON, II, JUDGE